IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Jeffrey Baker, : 
          Petitioner : 
           : No. 1176 C.D. 2017
          v. :
           : Submitted: January 5, 2018
Workers' Compensation Appeal :
Board (Meiborg, Inc. and Gallagher :
Bassett Services, Inc.), :
          Respondents :

BEFORE:    HONORABLE RENÉE COHN JUBELIRER, Judge
                HONORABLE PATRICIA A. McCULLOUGH, Judge
                HONORABLE JAMES GARDNER COLINS, Senior Judge

***OPINION NOT REPORTED***

MEMORANDUM OPINION
BY JUDGE McCULLOUGH                    FILED: April 30, 2018

      Jeffrey Baker (Claimant) petitions for review of the July 27, 2017 order of the Workers' Compensation Appeal Board (Board), which affirmed the order of a Workers' Compensation Judge (WCJ) denying Claimant's claim petition and petition for penalties. We affirm.

**Facts and Procedural History**

      Claimant began working for Meiborg, Inc. as a truck driver in February 2014. Claimant drove one of Employer's tractor-trailers, making deliveries in New York, Pennsylvania, New Hampshire, Maine and Ohio. On April 30, 2014, Claimant took his truck home "because the fairing looked loose and he wanted to check on it."

(WCJ's Finding of Fact (F.F.) No. 1(b).) Claimant injured his right arm and shoulder when he fell off of a ladder that he was standing on to look at the fairing. (WCJ's F.F. Nos. 1(a)-(c); Board's op. at 3.)

Following the injury, Claimant called Rob Lawrence, a dispatcher for Employer, to notify him of the injury but declined to go to the hospital, stating that, although his arm was sore and numb, he could drive. Employer's corporate secretary, Zach Meiborg, subsequently called Claimant to check on him and ask whether he needed to go to the hospital. Claimant responded that he wanted to wait a couple of days to see how his shoulder "reacted." (Board's op. at 3.) Three days later, Claimant spoke with Mr. Meiborg again and stated that he wanted to seek medical help because his shoulder was not getting better. When Claimant related to Mr. Meiborg that he was going to the hospital, Mr. Meiborg told him to "just go in, and we'll take care of it later." (*Id.* at 4; WCJ's F.F. Nos. 1(d), 1(f)-(g).)

The doctor who saw Claimant believed he had suffered a rotator cuff tear and gave him a prescription for an MRI. Claimant did not immediately have the MRI performed because he "wanted to hold off for a while." (Board's op. at 4.) Approximately two weeks later, the doctor's office called Mr. Mieborg, who then communicated with Employer's insurer, Gallagher Bassett, and Claimant had the MRI done. Gallagher Bassett paid Claimant's initial medical expenses and Claimant was scheduled for surgery on July 24, 2014. (*Id.*; WCJ's F.F. Nos. 1(h)-(k).)

On July 23, 2014, the day prior to his surgery, Claimant was involved in an argument with a customer and another employee and was terminated. Later that day, Gallagher Bassett informed Claimant that his claim was denied but stated that all of his medical expenses would be paid up to July 23, 2014. Claimant did not have the surgery done the following day.

2

In December 2014, Claimant filed a claim petition and a penalty petition,[1] and the matter was submitted to a workers' compensation judge (WCJ), who held multiple hearings.

With regard to the events of July 23, 2014, Claimant testified that he believed he was not scheduled to work that day,[2] but Employer called him that morning requesting that he pick up a trailer, drop it off at its destination, and leave, since they "knew [Claimant] had appointments in the afternoon." (Reproduced Record (R.R.) at 71a.) Claimant stated that he did so, but once he arrived at the destination, he was told that he would not be allowed to drop the trailer and that he had to stay. Claimant acknowledged getting into an argument with the dispatcher because he did not want to miss his appointment. He stated that Mr. Meiborg called him and informed him that he would be fired but needed to stay and wait for the tractor to be unloaded if he expected to be paid. Claimant did so, after which he was told to clean out his truck and return it. Claimant testified that, when Claimant returned home, Gallagher Bassett notified him that his claim would be denied but that it would pay for his medical bills up to July 23, 2014. Consequently, Claimant did not have the surgery. (WCJ's F.F. Nos. 1(k)-(m); Board's op. at 4-5.)

On cross-examination, Claimant stated that he did not recall Employer ever informing him that he was forbidden from taking his truck home, nor did he recall whether he received Employer's handbook after being hired. He testified that he took his truck home on multiple occasions and had sometimes washed and waxed it and that

---

[1] Claimant submitted a petition seeking reinstatement of benefits as well as penalties; however, the WCJ clarified that Claimant was in fact seeking workers' compensation benefits and therefore would treat his petition as a claim petition.

[2] During his testimony, Claimant acknowledged that he did not fill out a written vacation request because he was not "taking a vacation day," but was simply under the impression that he was not scheduled to deliver a load that day. (R.R. at 80a.)

3

Mr. Meiborg and two others were aware that he had done so. Claimant also denied that Employer had previously given him approval on a one-time-only basis to take his truck home. (Board's op. at 5.) Further, Claimant disagreed that Employer had a location where employees were to take the trucks for mechanical issues, and he denied ever having sustained a shoulder injury prior to the work incident in April. (*Id.*; WCJ's F.F. Nos. 1(o)-(p).)

Claimant, however, did agree that he was terminated for his refusal to deliver the load and for being argumentative, that he had issues with discipline prior to July 23, 2014, and that he had had arguments with Mr. Meiborg "here or there." (R.R. at 83a.) Claimant also acknowledged that no one witnessed the accident and that there was a place provided by Employer where the trucks were to be parked. Claimant stated that his shoulder continues to bother him and he is unable to lift more than five pounds above his head or do anything repetitive. Finally, Claimant stated that he began working for another employer in June or July, after which he started with his current employer in October 2014, where he earns more than he had with Employer. (WCJ's F.F. Nos. 1(q)-(u); Board's op. at 5; R.R. at 87a-88a.)

Claimant also presented the testimony of Jonathan Santos, who worked for Employer as a company employee and subsequently as an owner-operator for approximately two years. Mr. Santos testified that, while he was a company employee, he owned his vehicle and would take it home nearly every weekend. Mr. Santos stated that he told both Mr. Meiborg and another employee that he was doing so and that Employer did not object or reprimand him for it. Mr. Santos also stated that he recalled signing an employee handbook but did not know whether it stated that company trucks could not be taken home without permission. He testified that some of the other drivers also took their vehicles home, but acknowledged that he was not aware of whether they

4

had specific permission to do so or whether employees had been fired because of it. Mr. Santos testified that he had washed his truck using a ladder but agreed that Employer had a specific company that it used to wash its trucks. (WCJ's F.F. Nos. 2(a)-(i); Board's op. at 5-6.)

Finally, Claimant produced medical evidence in the form of reports indicating he was injured on April 30, 2014, and suffered a right rotator cuff tear, more specifically defined as "full thickness supraspinatus and infraspinatus tears" for which surgery was recommended and planned. (WCJ's F.F. No. 3.)

Employer submitted corrective action forms, demonstrating that Employer had a history of reprimanding and even terminating employees for taking trucks home without permission. Additionally, Employer presented the testimony of Mr. Meiborg, who handles the hiring, retention, and training of employees. Mr. Meiborg stated that Employer is an over-the-road trucking company that has its primary facility in Illinois, but serves customers in other states as well. Mr. Meiborg testified it is Employer's policy that trucks are to be parked at authorized locations and that to do otherwise requires written approval. Mr. Meiborg stated that Employer does not give blanket permission for employees to take their trucks home. Mr. Meiborg noted that Claimant was given, and signed an acknowledgement that he had received, a copy of the employee handbook, which sets forth Employer's policies, including its policy forbidding employees from taking vehicles home.[3] (WCJ's F.F. Nos. 5, 7(a)-(c); Board's op. at 6; R.R. at 296a.)

With regard to leave, Mr. Meiborg stated that Employer's policy requires employees seeking time off to fill out an electronic, documented request on a formal sheet called a "time off request form," which are approved by him or one other person.

---

[3] Mr. Meiborg stated that the policy was different for owner/operators since they owned their trucks. (R.R. at 322a.)

5

(Board's op. at 6.)  Mr. Meiborg indicated that Employer needs to know about requests for leave in advance for scheduling purposes.  (*Id.*)

Mr. Meiborg further testified that Employer does not want its drivers to fix the trucks, as they are not qualified, and their doing so could result in liability for Employer.  He stated that all maintenance issues are to be reported to the shop foreman, who finds a repairman in the area to fix the truck if there is an issue.  Mr. Meiborg noted that the employee handbook covers the proper reporting of maintenance issues, and that Claimant was aware of the process.  Additionally, Mr. Meiborg testified that Employer does not require or ask its drivers to wash the trucks as that is contracted through a third party, which all of its drivers use.  (WCJ's F.F. Nos. 7(i); Board's op. at 6-7.)

With regard to Claimant's injury, Mr. Meiborg stated that on May 1, 2014, he received an email notifying him that Claimant had sustained a minor injury when he fell off a ladder while washing his truck and was "okay to continue with his load." (R.R. at 303a.)  The following day, Mr. Meiborg stated that he personally spoke with Claimant, who stated that he was on a ladder cleaning his truck when he was injured. Mr. Meiborg acknowledged that he was aware that Claimant had testified otherwise. Specifically, he knew that Claimant testified that he was fixing the fairing when he was injured.  Mr. Meiborg explained that he initially reported the incident to its workers' compensation insurance carrier because Claimant implied that it was a workers' compensation injury and he assumed that Claimant was on duty when it occurred. Later, Mr. Meiborg stated that he became aware that Claimant was off duty and at home while working on the truck, against company policy, when the injury occurred.  Mr. Meiborg testified that he did not discipline Claimant and acknowledged this was probably an oversight; however, he stated that he spoke with Claimant and expressed

6

his disappointment that Claimant had taken the truck home against company policy. (WCJ's F.F. Nos. 7(f)-(h), (k); Board's op. at 7.)

As to the events leading up to Claimant's termination, Mr. Meiborg testified that Claimant advised that his surgery was scheduled for July 24 and requested that day off. However, Mr. Meiborg stated that Claimant did not request off on July 23 and was asked to deliver "a short load" to one of Employer's customers. (Board's op. at 7.) Mr. Meiborg stated that when Claimant arrived, the customer decided that "it was not going to be a drop and hook trailer, [and instead] wanted to live unload it." (R.R. at 308a.) As a result, Mr. Meiborg stated that Claimant "became irate with the customer [and, w]hen we called him to try to calm him down, he became irate with dispatch." (*Id.*) Mr. Meiborg indicated that this was at least the third incident of the kind in which Claimant had "agitated a customer, as well as the dispatchers." (R.R. at 309a.) As a result, Mr. Meiborg terminated Claimant. (WCJ's F.F. Nos. 7(l)-(m); Board's op. at 7-8.)

Employer also presented the testimony of its driver manager, Sean Van Dusen, who had worked in trucking for nearly 20 years. Mr. Van Dusen testified that there is no need to use a ladder when inspecting or washing a truck and confirmed that Employer had a policy requiring both written and verbal permission to take a truck home. Additionally, he testified that Employer's policy is to have the driver notify the shop if there are mechanical issues with the trucks, and noted that Employer's handbook contained a phone number for maintenance, as well as an after-hours emergency number. Mr. Van Dusen stated that, within fifteen minutes of reporting a maintenance issue, the driver is contacted and told where the vehicle should be taken for repairs. Finally, Mr. Van Dusen stated that he would never do maintenance on his own truck, acknowledged he had taken his truck home on occasion with specific

7

approval, and confirmed that Employer had a relationship with a company for truck washing. (WCJ's F.F. Nos. 8(a)-(e); Board's op. at 8.)

Employer presented the testimony of Anthony Hilegass, who formerly worked for Employer as a driver for one year and seven months. Mr. Hilegass testified that when he was hired, he received an employee handbook, which set forth Employer's policy that drivers could not take trucks home without permission. He stated that he had twice gotten permission to take his truck home by calling and asking. He also acknowledged that he had done so without permission and had been verbally reprimanded as a result. Mr. Hilegass testified that, during his 20-year career, he had washed trucks but stated he had never used a ladder to do so and had never used a ladder to climb onto a truck because "it's just not safe." (R.R. at 266a.) He likewise confirmed that he was aware that Employer had a contract with a company for washing its trucks. When asked about performing maintenance on his truck, Mr. Hilegass stated that he had installed a lightbulb, but had done so with permission and from a position standing on the ground. Additionally, he stated that it was Employer's procedure for maintenance issues to have drivers call in to report them, at which point they would receive instructions. Finally, Mr. Hilegass stated that Employer's policy with regard to leave required the employee to ask for and receive permission to take off ahead of time. (WCJ's F.F. Nos. 9(a)-(f); Board's op. at 8-9; R.R. at 269a.)

Employer also presented the testimony of Michael Hilgart, who has worked as a dispatcher for Employer for seven years. Mr. Hilgart testified that Employer has a policy that requires drivers to have written permission to take a truck home; however, he indicated that some drivers have blanket permission to do so because "they are in more of a supervisory role." (Board's op. at 9.) Mr. Hilgart also stated that drivers are permitted to take trucks home in cases of emergencies on Sunday

8

nights so that there is not a service failure to customers on Monday mornings. With regard to Claimant, Mr. Hilgart stated that Claimant had requested specific permission to take his truck home, but did not have blanket permission to do so. (WCJ's F.F. Nos. 10(a)-(b); Board's op. at 9.)

Mr. Hilgart also testified that written permission is required for employees to take vacation and that, while Claimant had emailed to request leave in the past, Mr. Hilgart saw no record of Claimant having requested leave on the day before his surgery. As to the events on the day of Claimant's termination, Mr. Hilgart testified that Claimant became "very angry" with the customer because the process was taking too long, at which point Mr. Hilgart handed the matter over to Mr. Meiborg. (R.R. at 257a.) Mr. Hilgart noted that Claimant had had other issues with customers where he had not acted professionally. Finally, as to Claimant's injury, Mr. Hilgart testified that Claimant initially reported the injury to him, advising that it occurred while he was washing his truck. (WCJ's F.F. Nos. 10(c)-(d); Board's op. at 9.)

Finally, Employer presented the testimony of Thomas DiBenedetto, M.D., a board-certified orthopedic surgeon who examined Claimant in June 2015, and diagnosed him with a two tendon retractor rotator cuff tear. He noted that some of the findings could be degenerative conditions. Dr. DiBenedetto reviewed Claimant's records, which indicated that Claimant had fallen from a ladder and injured his right shoulder but had not taken any time off of work. He noted that the medical records from his initial visits after the injury did not include any mention of a work injury and that surgery was scheduled but did not go forward. Dr. DiBenedetto also reviewed Claimant's testimony and noted that, despite the condition of his shoulder, Claimant continued to work full duty. He explained that some people live with rotator cuff symptoms for years. Ultimately, Dr. DiBenedetto stated it was his belief that Claimant

9

had not injured himself as a result of his work duties because the events he reported were inconsistent and vague and because he had continued driving without missing any work. Dr. DiBenedetto acknowledged that, at some point, Claimant should get his rotator cuff fixed, but opined that Claimant is capable of working full duty. (WCJ's F.F. Nos. 4(a)-(h); Board's op. at 9; R.R. at 392a, 436a.)

The WCJ found the testimony of Employer's witnesses to be credible, noting that they were generally consistent and often supported by documentation. Conversely, the WCJ found that Claimant's testimony was not entirely credible and rejected it to the extent that it contradicted the testimony of Employer's witnesses. Further, the WCJ found that medical evidence demonstrated that Claimant incurred a right rotator cuff tear and that further treatment was necessary. However, the WCJ stated that, even if Claimant's testimony were credible, his injury would not constitute a work injury because truck washing, truck maintenance, and taking the truck home were not within the scope of his employment. Thus, the WCJ denied the claim petition and penalty petition. (WCJ's F.F. Nos. 11-15.)

Claimant appealed to the Board, but the Board affirmed. Claimant now petitions for review with this Court.[4]

## Discussion

In a workers' compensation proceeding, the WCJ is the ultimate fact finder and is the sole authority for determining the weight and credibility of evidence. *Lombardo v. Workers' Compensation Appeal Board (Topps Company, Inc.)*, 698 A.2d

---

[4] Our scope of review is limited to determining whether findings of fact are supported by substantial evidence, whether an error of law has been committed, or whether constitutional rights have been violated. Section 704 of the Administrative Agency Law, 2 Pa.C.S. §704; *Meadow Lakes Apartments v. Workers' Compensation Appeal Board (Spencer)*, 894 A.2d 214, 216 n.3 (Pa. Cmwlth. 2006).

1378, 1381 (Pa. Cmwlth. 1997). "As such, the WCJ is free to accept or reject the testimony of any witness, including medical witnesses, in whole or in part." *Id.* The WCJ's findings will not be disturbed on appeal when they are supported by substantial, competent evidence. *Greenwich Collieries v. Workmen's Compensation Appeal Board (Buck)*, 664 A.2d 703, 706 (Pa. Cmwlth. 1995). "Substantial evidence is such relevant evidence which a reasonable mind might accept as adequate to support a finding." *Berardelli v. Workmen's Compensation Appeal Board (Bureau of Personnel, State Workmen's Insurance Fund)*, 578 A.2d 1016, 1018 (Pa. Cmwlth. 1990).

Moreover, where both parties present evidence, it is irrelevant that the record contains evidence which supports a finding contrary to that made by the WCJ; rather, the pertinent inquiry is whether evidence exists that supports the WCJ's findings. *Hoffmaster v. Workers' Compensation Appeal Board (Senco Products, Inc.)*, 721 A.2d 1152, 1155 (Pa. Cmwlth. 1998).

Additionally, on appeal, all inferences drawn from the evidence shall be taken in favor of the party prevailing before the WCJ. *Krumins Roofing & Siding v. Workmen's Compensation Appeal Board (Libby)*, 575 A.2d 656, 659 (Pa. Cmwlth. 1990).

### a. Prompt Determination and Equitable Estoppel

Before this Court, Claimant raises three issues. In his first and second related issues, he argues that the Board erred by failing to award Claimant benefits where Employer failed to comply with the prompt-determination requirements of 77

11

P.S §717.1[5] and 34 Pa. Code §121.13,[6] after being notified that Claimant had sustained an alleged work-related injury. Claimant argues that Employer induced him into believing that his injury was going to be treated as a workers' compensation injury for approximately three months by failing to timely deny his claim, "only then to abruptly fire him the day before that surgery, [and] direct[] that the surgery be cancelled." (Claimant's brief at 10.) Claimant cites to *Mosgo v. Workmens' Compensation Appeal Board (Tri-Area Beverage, Inc.)*, 480 A.2d 1285 (Pa. Cmwlth. 1984), and *Kelly v. Workmen's Compensation Appeal Board (DePalma Roofing)*, 669 A.2d 1023 (Pa. Cmwlth. 1995), arguing that Employer's voluntary payment of Claimant's medical bills up to the date of his termination makes its challenge to liability per se unreasonable because, if Employer had denied his claim sooner, he would have still been able to use his health insurance through Employer to pay for the surgery. Thus, Claimant asserts that Employer's "inappropriate conduct" left him without workers' compensation benefits as well as without health insurance (due to his termination) and thus without the ability to pay for the surgery. (Claimant's brief at 10.) Claimant requests that this Court reverse the Board on the basis of equitable estoppel arising from Employer's alleged misconduct and remand to the WCJ for calculation of appropriate counsel fees.

---

[5] Section 406.1 of the Workers' Compensation Act (Act), added by the Act of February 8, 1972, P.L. 25, *as amended*, 77 P.S. §717.1, requires prompt payment of compensation or further notice of the decision within 21 days after the employer becomes aware of the injury.

[6] This regulation states:

> If compensation is controverted, a Notice of Workers' Compensation Denial, Form LIBC-496, shall be sent to the employee or dependent and filed with the Bureau, fully stating the grounds upon which the right to compensation is controverted, within 21 days after notice or knowledge to the employer of the employee's disability or death.

34 Pa. Code §121.13

In response, citing *Bailey v. Workers' Compensation Appeal Board (ABEX Corp.)*, 717 A.2d 17 (Pa. Cmwlth. 1998), Employer notes that an employer's voluntary payment of an employee's medical bills is not an admission of liability. Employer also distinguishes *Mosgo* and *Kelly*, stating that those cases stand for the proposition that employers who make voluntary payments to employees while reserving the right to deny a workers' compensation claim in the future are estopped from denying the compensability of the claim since reservation of rights is null and void under the Act.

We agree. As in *Bailey*, here, Employer's payment of Claimant's medical expenses up to July 23, 2014, did not constitute an admission of liability for an unaccepted injury. 77 A.2d at 19 ("[W]hen an employer voluntarily pays a claimant's medical bills, it should not be considered an 'admission' of liability on behalf of the employer."). As such, Claimant's argument that Employer is estopped from contesting the work-related injury fails.

Further, in *Lemansky v. Workers' Compensation Appeal Board (Hagan Ice Cream Company)*, 738 A.2d 498 (Pa. Cmwlth. 1999), this Court held that a claimant was entitled to attorney's fees where there was no dispute as to the compensability of the work-related injury and the employer "attempted to evade entering into an agreement recognizing the injury as required by § 406.1 of the Act on the basis that the claimant did not suffer a loss of earnings. 77 P.S. § 717.1." *Id.* at 503.

Conversely, here, we note that Mr. Meiborg testified it did not matter to him whether Claimant's surgery was paid for through Employer's health insurance or workers' compensation insurance because Employer's premiums would increase either way and "getting [his] employees healthy and getting the freight delivered" was his main concern. (R.R. at 314a.) He stated that he reported the injury to Gallagher Bassett

13

and left it to the company's adjustors to investigate and determine whether it was in fact a work-related injury. (R.R. at 329a.) Mr. Meiborg testified that he did not express an opinion as to whether he believed Claimant suffered a work-related injury because it would have been inappropriate for him to do so, as that decision was for the insurance company to decide after conducting an investigation. (R.R. at 328a-29a.) When asked about why there was a delay in the insurance company's determination, Mr. Meiborg indicated that he did not know but believed that it had to do with turnover of employees at the insurance company. (R.R. at 329a.)

Here, Employer did not make voluntary payments to Claimant with the intent to compensate him in lieu of accepting his injury, nor did it purposefully evade entering into an agreement recognizing the injury as required under the Act, while acknowledging that there was a work-related injury. As such, the facts of this case are distinguishable from *Mosgo*, *Kelly*, and *Lemansky*, and Employer was not estopped from contesting Claimant's claim. Further, Employer demonstrated that its contest was reasonable given that Claimant was in violation of at least two of Employer's policies: (1) taking the vehicle home, and (2) washing or performing maintenance on the vehicle. Accordingly, Claimant is not entitled to attorney's fees.[7]

---

[7] Claimant is likewise not entitled to payment for Employer's failure to issue a notice of denial within 21 days under section 406.1 of the Act. Section 406.1 states that the first installment of compensation is due no later than 21 days after the employer has notice or knowledge of the employee's disability and provides for the accrual of 10% interest on "all due and unpaid compensation at the rate of [10%] per annum." 77 P.S. §717.1(a).

In this case, however, Claimant cannot receive interest on payments to which he is not entitled. As we noted in *Brutico v. Workers' Compensation Appeal Board (U.S. Airways, Inc.)*, 866 A.2d 1152 (Pa. Cmwlth. 2004), "Because there was a violation of the Act, penalties would have been awardable. However, the claim petition had to be granted as well as some 'measure' against which the WCJ could use to award penalties. Because Claimant's petition was denied, no penalties [can] be awarded." *Id.* at 1156 (internal citations omitted). *See also Coyne v. Workers' Compensation Appeal Board*

## b. Spoliation of Evidence

In his final issue, Claimant argues that the Board erred in refusing to overturn the WCJ for disregarding the issue of Employer's willful destruction of material evidence. Specifically, Claimant states that Employer was put on notice of Claimant's intent to file a claim petition five days after his termination. Claimant asserts that, despite this knowledge, Employer destroyed driver log books of Claimant and others, which would have conclusively demonstrated the extent to which Claimant and other employees were routinely permitted to take vehicles home. Claimant contends that the driver logs were relevant since the WCJ denied the claim petition "on the theory that drivers were supposedly forbidden from—and never did, without being sanctioned—taking vehicles home." (Claimant's brief at 33.)

In response, Employer argues that the driver logs were not relevant, and even if they were, they were not destroyed by Employer in bad faith. Specifically, Employer states that the WCJ did not need to address the issue of the driver logs during the time that Claimant worked for Employer because WCJ did not require them in order to determine that taking the truck home when Claimant was neither a supervisor, nor the owner of the truck, was not within the scope of his employment.

Employer also argues that the log books were only reviewed to determine driver compliance with federal Department of Transportation records, and that Mr. Meiborg's testimony demonstrated that it was Employer's policy to only keep the records for six months, after which they were automatically destroyed. Thus, Employer

---

*(Villanova University)*, 942 A.2d 939, 951 (Pa. Cmwlth. 2008) ("We are not aware of any authority permitting an award of benefits to a claimant who would not otherwise be entitled to them based upon an employer's failure to comply with the Act."); *Palmer v. Workers' Compensation Appeal Board (City of Philadelphia)*, 850 A.2d 72, 77 (Pa. Cmwlth. 2004) ("[W]e will not award penalties based upon unknown numbers . . . .") (internal quotation marks omitted).

15

asserts that if driver logs were missing at the time of litigation, it was solely because of Employer's general policy of destroying them and not as a result of the bad faith of Employer.

When determining the proper penalty for the alteration or destruction of evidence, relevant factors for the court to consider include: "(1) the degree of fault of the party who altered or destroyed the evidence; (2) the degree of prejudice suffered by the opposing party, and (3) the availability of a lesser sanction that will protect the opposing party's rights and deter future similar conduct." *Schroeder v. Department of Transportation*, 710 A.2d 23, 27 (Pa. 1998).

In this case, it does not appear the destruction of the log books was done in bad faith. During his testimony, Mr. Meiborg emphasized that he was not experienced with the workers' compensation matters, was "new to the PA trucking market, [ ] absolutely new to the work comp. market, and [was] just unaware of how things are done." (R.R. 327a.) Additionally, as Employer notes, Mr. Meiborg stated that Employer had a policy for destruction of physical log books, which was followed with regard to the records here, where an employee in the log audit department would handle the weekly shredding and discarding the log books older than six months. (R.R. at 322a.) As to electronic log books, which Employer began using in some vehicles in 2014, Mr. Meiborg stated that they were "just automatically disposed of through our vendor." (R.R. at 323a-24a.) Thus, Employer followed its usual policy regarding destruction of books here. Critically, Employer did not selectively destroy specific logs, nor did it destroy the books before the six month point. As such, we conclude that their destruction was done in accordance with a bona fide company policy and there is no evidence to suggest that Employer destroyed the records in bad faith or with the intent of discarding inculpatory evidence.

16

Additionally, we fail to see how Claimant was prejudiced, as Claimant was able to present other evidence in support of his argument that drivers who took their trucks home would have documented it in the log books, which Employer had the opportunity to review. Specifically, Claimant testified to his belief that he was able to take his truck home at will and that Employer was aware that he did so. (R.R. at 77a-79a.) Claimant also presented the testimony of Mr. Santos, who also testified that he frequently took his truck home and documented it in his log book. (R.R. at 273a-74a.) Further, two of Employer's witnesses, Mr. Hilegass and Mr. Van Dusen, testified that, if and when they took their trucks home, they would indicate it in their log books, which were submitted to Employer for review. (R.R. at 268a, 287a-88a.) Thus, presentation of the log books would have been duplicative of the testimony of the numerous witnesses.

Moreover, Mr. Meiborg, whose testimony the WCJ found to be credible, stated that in 2014, he had one employee, Mike Morris, who reviewed the drivers' log books to ensure that the drivers were compliant with federal Department of Transportation regulations and to confirm that the tolls and fuel the drivers reported confirmed that the drivers "were where they said they were supposed to be at that time." (R.R. at 324a.) Mr. Meiborg acknowledged that if a driver had taken a vehicle home and reported it on the log, it would have been noticeable to anyone looking at the log; however, he testified that Mr. Morris would not have been checking the log books to determine whether employees had taken their trucks home, as Mr. Morris was not privy to information regarding whether drivers were permitted to do so. (*Id.*)

Notwithstanding Mr. Meiborg's acknowledgement that Employer had the opportunity to review the log books but did not direct the employee who did so to review whether drivers were abiding by its policies, the WCJ still found that Employer

17

had a policy against drivers taking their vehicles home. As such, Claimant's attempt to show that employees who took their trucks home, including those who did so frequently in violation of Employer's policy, documented it in the log books that Employer had the ability to review, was not hindered by his inability to present the physical books.

Furthermore, even if Claimant had been able to use the log books to prove that Employer did not have, or did not enforce, a policy regarding taking vehicles home, Claimant's argument nonetheless fails because that evidence would not have addressed or disputed the WCJ's findings that Claimant was otherwise outside the scope of his employment when he was injured because he was violating one of Employer's two other policies against allowing drivers to wash or perform maintenance on their trucks. As such, Claimant's argument regarding the spoliation of evidence fails. *See Nevin Trucking v. Workmen's Compensation Appeal Board (Murdock)*, 667 A.2d 262, 268 (Pa. Cmwlth. 1995) (holding that a truck driver who was injured while changing a tire in direct violation of a positive order was not within the scope of his employment).

**Conclusion**

In conclusion, Claimant's argument that Employer was estopped from contesting the claim petition fails because Employer's payment of Claimant's medical bills did not constitute an admission of liability for an unaccepted injury. Further, Claimant is not entitled to attorney's fees since Employer's contest was reasonable as Claimant was outside the scope of his employment when injured. Finally, we do not agree that Employer's destruction of the log books was done in bad faith or that Claimant was prejudiced as a result.

Accordingly, we affirm the order of the Board.

18

_____
PATRICIA A. McCULLOUGH, Judge


Senior Judge Colins dissents.

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Jeffrey Baker, : 
                Petitioner : 
                 :   No. 1176 C.D. 2017 
           v. : 
                 : 
Workers' Compensation Appeal : 
Board (Meiborg, Inc. and Gallagher : 
Bassett Services, Inc.), : 
                Respondents : 

## ***ORDER***

AND NOW, this 30th day of April, 2018, the July 27, 2017 order of the Board is hereby affirmed.

_____
PATRICIA A. McCULLOUGH, Judge